# IN THE SUPREME COURT OF IOWA

No. 20–0192

Submitted October 20, 2021—Filed February 25, 2022

**STATE OF IOWA,**

Appellee,

vs.

**KEVIN JON THOREN,**

Appellant.

_____

On review from the Iowa Court of Appeals.


Appeal from the Iowa District Court for Polk County, Jeffrey D. Farrell, Judge.


The defendant seeks further review of the court of appeals decision affirming his conviction for sex abuse and the district court rulings allowing evidence of the licensing board's investigation and settlement and his prior bad acts. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**


Oxley, J., delivered the opinion of the court, in which Christensen, C.J., and Appel and McDermott, JJ., joined. Waterman, J., filed a special concurrence,

in which Mansfield, J., joined. Mansfield, J., filed a special concurrence, in which Waterman and McDonald, JJ., joined.

Martha J. Lucey, State Appellate Defender, and Ashley C. Stewart (argued), Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Bridget A. Chambers (argued), Assistant Attorney General, for appellee.

**OXLEY, Justice.**

"It is fundamental to American jurisprudence that 'a defendant must be tried for what he did, not for who he is.' " *United States v. Foskey*, 636 F.2d 517, 523 (D.C. Cir. 1980) (quoting *United States v. Myers*, 550 F.2d 1036, 1044 (5th Cir. 1977)). Our rules prohibit using a defendant's prior bad acts as propensity evidence—that is, to show that because a defendant did something before, he must have done it again. That said, evidence of prior bad acts can be used for other purposes, but only if the other purpose is truly disputed in the case. And when the evidence is allowed, the district court must take care to limit use of the evidence to the proper use, not the prohibited propensity use.

The defendant in this case, who was convicted of sexually abusing a client during a Reiki treatment session, argues the court of appeals erred in affirming his conviction because the district court violated this fundamental principle. Specifically, the defendant asserts the State should not have been allowed to introduce evidence about an investigation by the Iowa Board of Massage Therapy (Board) into allegations he had inappropriately touched other clients that ultimately led to the loss of his massage license or testimony from those complaining former clients. Given the unique circumstances of this case and the significant evidence presented about "phantom touches" in the defendant's attempt to convince the jury the victim only imagined that the defendant vigorously rubbed her vaginal area with his hand during the Reiki session, we conclude the district court properly admitted some evidence from the defendant's former massage clients about their experiences. But the district court erred in

allowing evidence about the Board's investigation, which gave the Board's imprimatur of wrongdoing. The district court also failed to identify which issues were truly disputed, which led the district court to allow more testimony from the former clients than was permissible. The State's closing argument reveals the risk that the jury used the evidence for the prohibited purpose, not the allowed purpose, when the State urged the jury to consider the prior incidents to decide "did he intend to do this to her. He's done it to five other women." The defendant is entitled to a new trial.

### I. Factual Background & Proceedings.

Kevin Thoren voluntarily surrendered his license to practice massage therapy in September 2018 following an investigation by the Board. The investigation arose from a complaint of inappropriate touching filed by a client named L.K. The complaint alleged that during a massage in 2014 Thoren exposed L.K.'s breasts and pulled on her nipples. Although Thoren voluntarily surrendered his license after the investigation, the self-surrender included no admission of guilt.

In addition to L.K., four other clients filed complaints with the Board about inappropriate sexual conduct during appointments with Thoren. J.J., who worked for Thoren, complained in 2017 that Thoren had massaged too close to her breasts in 2008 and 2009 after she asked him not to and that Thoren had used an electric vibrating machine against her wishes. J.J. was so upset that she quit working for Thoren after the incidents. In 2017, M.L. complained that Thoren had massaged the side of her breast during a 2012 appointment in an

inappropriate way while panting and breathing heavily in a way that made her believe he was aroused. In 2016, A.N. complained that Thoren had placed an electric vibrating machine on her breasts, lower abdomen, and uncomfortably close to her vagina during appointments in 2009. Finally, upon hearing about the charges against Thoren, his sister-in-law, S.T., told law enforcement about a massage in 2009 during which Thoren had placed an electric vibrating machine on her crotch area and over her clitoris. S.T. eventually filed a complaint with the Board in August 2019. Thoren was not criminally charged for any of the complaints filed by these former clients with the Board. This case is about later events with another client, L.R., involving nonmassage healing treatments. Yet the Board's investigation and his prior conduct formed the opening evidence presented by the State at Thoren's trial for sexually abusing L.R.

Thoren continued to offer alternative healing modalities, including Reiki and craniosacral therapy, after surrendering his massage license. The client remains fully clothed for these treatments. According to the evidence presented at trial, Reiki, often referred to as a type of energy therapy, is an ancient form of natural hands-on healing where the practitioner holds his hands over the client's body to facilitate a transfer of energy to help the body heal itself. In a Reiki treatment, the practitioner either gently touches or holds his hands lightly above the client's body without actually touching it. Reiki is different from massage in that Reiki involves no rubbing, kneading, or manipulation. The practitioner holds his hands stationary in specific positions, either hovering over or gently

touching the client's body, and removes his hands each time he moves to the next hand position.

Craniosacral therapy is also distinct from massage. It focuses on the bone structure between the skull and the sacrum bone at the base of the spine and works to improve movement of cerebral spinal fluid throughout the spine. The practitioner gently touches certain areas on the head or the sacrum—described as using pressure equal to the weight of a dime—with no movement or manipulation.

The story that led to the charges for which Thoren stood trial actually starts here. On November 21, 2018, L.R. was attending her second appointment with Thoren. L.R.'s first appointment for a craniosacral therapy treatment provided relief for her neck and headaches, so she booked a second appointment online. The appointment receipt shows that L.R. signed up for Reiki therapy, although she intended to book another craniosacral therapy session. This distinction matters because Thoren's theory at trial was that L.R. imagined the physical contact she claims she experienced, introducing evidence that clients may feel phantom touching—a feeling of being touched in places where no contact has occurred—during Reiki sessions like L.R. received.

The parties disagree on the facts of what happened during L.R.'s second appointment. According to L.R., Thoren covered her eyes with a cloth and stated that he was going to "work on [her] vaginal area." Thoren then began to rub L.R.'s stomach with his hand over her clothes, moving his hand down her body and eventually applying increasing amounts of pressure and rubbing vigorously over

her clitoris, vagina, and anal area, repeatedly asking her to describe what she was feeling. L.R. did not know what to do at first but was finally able to tell Thoren to stop and left the appointment. L.R. filed a sexual assault report with the police in February 2019.

Thoren describes a very different account. According to Thoren, during a conversation at the start of the second appointment L.R. repeatedly mentioned that her sexual energy had returned after her last session. Thoren ignored the comments and began the session, which included both craniosacral therapy and Reiki. He recalled touching L.R. at the start of the session while performing craniosacral therapy, but denied touching her at any point during the Reiki treatment and denied ever touching her vaginal area. Thoren held his hands above L.R.'s naval and her solar plexus, which is the common method for conducting the Reiki treatment. He also insisted that he ended the session after L.R. groaned and said she had just experienced an orgasm. He repeatedly told her that was not the purpose or intent of the therapy.

Prior to trial, Thoren moved to exclude evidence from the Board relating to the previous complaints against him. The district court denied his motion and permitted a Board representative to testify about the Board's investigation and the five former clients to testify about Thoren's inappropriate touching during massage sessions. The jury ultimately found Thoren guilty of sexual abuse in the third degree. Thoren appealed his conviction, challenging the admission of evidence about the Board's investigation and report as well as the testimony from

his former clients. The court of appeals affirmed, and we granted Thoren's application for further review.

## II. Standard of Review.

Thoren appeals the district court's evidentiary rulings, which we review for abuse of discretion. *Stender v. Blessum*, 897 N.W.2d 491, 501 (Iowa 2017). "A district court abuses its discretion when it bases its decisions on grounds or reasons clearly untenable or to an extent that is clearly unreasonable . . . [or] if it bases its conclusions on an erroneous application of the law." *Id.* (citation omitted).

## III. Error Preservation.

The State argues the district court's motion in limine ruling was conditional, so Thoren failed to preserve error on the issues raised in his motion to the extent he did not also object to the evidence at trial. Although Thoren objected at trial to the State's introduction of the Board's report, he did not object to testimony from his former clients.

Thoren moved in limine to exclude (1) testimony and other evidence relating to the Board investigation which led to the self-surrender of his license and (2) testimony from any former clients alleging abuse during a massage. He argued that this evidence was irrelevant under Iowa Rule of Evidence 5.402, that it would be unfairly prejudicial under rule 5.403, and that it was improper propensity evidence under rule 5.404(*b*). The State resisted and affirmatively requested to admit the evidence of prior acts related to revocation of Thoren's license and the Board's investigation of the five complaints, arguing the

challenged evidence was relevant to show: Thoren's knowledge that the types of massages he had previously engaged in were inappropriate; Thoren's motive or modus operandi to sexually assault women "under the cloak of 'healing work' or 'therapy' "; Thoren's general intent to commit a sex act as opposed to a mistake or accident; Thoren's plan to "lull women into a sense of security before assaulting them"; and Thoren's consciousness of guilt from the surrender of his license.

The district court denied Thoren's motion and granted the State's request, conditioned on satisfying foundational issues for admitting the evidence. The State subsequently listed the five prior clients as witnesses, and Thoren moved to reconsider the court's prior ruling and strike the identified witnesses. The court denied Thoren's motion, ordering: "The State's proposed witnesses may offer testimony within the parameters of that [prior] ruling."

Generally, denial of a motion in limine does not preserve error for appellate review. *State v. Leedom*, 938 N.W.2d 177, 191 (Iowa 2020); *Quad City Bank & Tr. v. Jim Kircher & Assocs., P.C.*, 804 N.W.2d 83, 89 (Iowa 2011). Motions in limine are procedural rulings that "serve[] the useful purpose of raising and pointing out before trial certain evidentiary rulings the court may be called upon to make during the course of the trial." *Quad City Bank & Tr.*, 804 N.W.2d at 89 (quoting *Twyford v. Weber*, 220 N.W.2d 919, 923 (Iowa 1974)). If denied, the resisting party must object at the time the evidence is offered at trial to preserve a challenge to the evidence on appeal. *Twyford*, 220 N.W.2d at 924. If sustained, the ruling "excludes reference or introduction of this evidence until its

admissibility is determined by the trial court, outside the presence of a jury, in an offer of proof." *Quad City Bank & Tr.*, 804 N.W.2d at 89. Error arises when the evidence is introduced at trial, not from ruling on the motion in limine.

As with most rules, there is an exception. "[I]f the ruling [on the motion in limine] reaches the ultimate issue and declares the evidence admissible or inadmissible, it is ordinarily a final ruling and need not be questioned again during trial." *State v. Alberts*, 722 N.W.2d 402, 406 (Iowa 2006) (quoting *State v. O'Connell*, 275 N.W.2d 197, 202 (Iowa 1979) (en banc)). The ruling on Thoren's motion in limine left no question about its finality, concluding: "[T]he State will be allowed the opportunity to present evidence of prior incidents of unwanted sexual touching during massages." The district court reaffirmed its ruling in response to Thoren's motion to reconsider and strike the identified witnesses: "The State's proposed witnesses may offer testimony within the parameters of that [prior] ruling." The ruling on the motion in limine preserved the evidentiary issues without the need for objections during trial.

### IV. Analysis.

We consider two evidentiary issues on appeal: (1) the admission of evidence from the Board investigation as a violation of rules 5.402 and 5.403 and (2) the admission of testimony from five prior clients as a violation of rule 5.404(*b*).

**A. Board Investigation.** Thoren claims the district court committed reversible error by admitting evidence about the Board's investigation that led to the loss of his massage license. Tony Alden, the Board's administrator, testified

about the process the Board uses to investigate complaints against licensees, different ways an investigation can be handled, and benefits to a licensee of avoiding a public hearing if he enters a settlement rather than contesting the complaint. The State introduced as an exhibit the Board's combined statement of charges, settlement agreement, and final order related to its investigation into complaints filed against Thoren, and Mr. Alden explained the contents of the findings and the process for notifying the complainants about the Board's resolution. The statement included the charge—not admitted by Thoren although the statement did not make that clear—that Thoren "touched a client's breasts for a non-therapeutic purpose." The State used this evidence to bolster the credibility of Thoren's former clients, arguing the Board's notification to each of them revealed the license revocation was based, at least in part, on each of their complaints.

Thoren contends this evidence should have been excluded as unduly prejudicial under rule 5.403. "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Iowa R. Evid. 5.403. After finding the challenged evidence is relevant, we use a two-part test to determine whether it should nonetheless be excluded. *State v. Buelow*, 951 N.W.2d 879, 889 (Iowa 2020). "First, we 'consider the probative value of the evidence.' Second, we balance the probative value 'against the danger of its prejudicial or wrongful effect upon the triers of fact.' " *State v. Huston*, 825

N.W.2d 531, 537 (Iowa 2013) (citation omitted) (quoting *State v. Cromer*, 765 N.W.2d 1, 8 (Iowa 2009)). While we ordinarily defer to the district court's balancing of these factors, *State v. Buman*, 955 N.W.2d 215, 221 (Iowa 2021), deference is difficult here where the district court did no balancing.

Evidence is relevant when "it has any tendency to make a fact more or less probable than it would be without the evidence[] and . . . [t]he fact is of consequence in determining the action." Iowa R. Evid. 5.401. Thoren argues the Board applied a lower burden of proof and considered different elements in its licensure investigation than required for the State to prove the criminal charges against him, rendering evidence from the Board's investigation irrelevant and unfairly prejudicial. We reject Thoren's argument that the different settings between an agency investigation and a criminal trial necessarily make evidence from the Board's investigation irrelevant. "[R]elevance is a relatively low bar . . . ." *State v. Neiderbach*, 837 N.W.2d 180, 238 (Iowa 2013) (Appel, J., concurring specially). That Thoren was investigated by the Board using different standards does not in itself make evidence from the investigation irrelevant to the criminal charges.

While the different standards do not necessarily make evidence from the Board's investigation irrelevant, we have cautioned that introducing professional standards with lower burdens of proof in a criminal trial creates a significant risk of prejudice. *See Buman*, 955 N.W.2d at 221. In *Buman*, a nurse was charged with wanton neglect of a healthcare facility resident and the jury received evidence and instructions about the definition of accountability in the nursing

professional standards. *Id.* at 219–20. Even though a separate instruction informed the jury that violating the professional standards did not amount to a crime, introducing evidence about the lower standard that applied to violations of the professional standards risked confusing the issues and misleading the jury. *Id.* at 221. Here, the State presented considerable evidence through Alden's testimony about the nature of the Board's investigation without clarifying standards of proof at all. Thoren's concerns about the differing standards are more properly assessed under the balancing test required by rule 5.403. We therefore compare the probative value of the challenged evidence to its prejudicial effect.

According to the State, evidence from the Board investigation is probative because it "makes it more likely that Thoren committed sexual abuse when he touched the victim in the case at bar." In other words, it provides propensity evidence. Rule 5.404(*b*) does not allow evidence to be used for this purpose. Iowa R. Evid. 5.404(*b*)(1). We likewise reject the suggestion that the Board evidence is probative of the victim's credibility in this he said, she said case. Evidence about the Board's investigation cannot be used when its sole relevance is to enhance the credibility of the victim. *See State v. Mitchell*, 633 N.W.2d 295, 299–300 (Iowa 2001).

The State asserts that the evidence was also relevant to show that Thoren had surrendered his massage license. This might have been a valid purpose for introducing some evidence from the Board's investigation—if Thoren's license to perform massages was somehow relevant to the criminal charges against him.

*See Huston*, 825 N.W.2d at 537 (cautioning that " 'the line of inadmissibility' may be crossed when an investigator's testimony goes 'beyond the point of merely explaining why certain responsive actions were taken' " (quoting *State v. Elliott*, 806 N.W.2d 660, 668 (Iowa 2011))). But Thoren was not charged with providing massage therapy services without a license—indeed, he was not required to be licensed to provide the craniosacral and Reiki therapy he performed on L.R. In any event, the State could have proved the simple fact that Thoren was not licensed to provide massage therapy without introducing evidence of the Board's investigation and settlement.[1]

The court of appeals found the evidence relevant to help show that Thoren "should have been aware of the line between proper and improper touching during a massage as a result of the prior sanction," but we disagree that this is a proper purpose. By that reasoning, the state would be generally permitted to show evidence of prior convictions in order to demonstrate that the defendant "should have been aware" of the line between lawful and unlawful conduct. Nobody suggested or argued that Thoren was unaware of the proper line between proper and improper touching.

---

[1]We reject the State's argument that "evidence that at the time of his session with L.R., Thoren no longer had a massage license helped establish that he lacked a legitimate, lawful reason to rub L.R.'s genitals." Even with a massage license, Thoren would have no legitimate reason to rub L.R.'s genitals. Further, Thoren has never asserted he had a legitimate reason to touch L.R.'s vaginal area—he denied touching her at all. This theory does not make evidence Thoren had surrendered his license relevant. *See State v. Prine*, 200 P.3d 1, 11 (Kan. 2009) (holding the state "could not open the door for itself" to prior bad acts evidence by putting up a theory contrary to the defendant's theory at trial and then using the prior evidence to rebut the state's theory).

The most the State can make of Thoren's surrender of his license is the fact that his license number appeared on the website L.R. used to book her appointments, which theoretically could have relevance as context or background information to the extent it gave L.R. false assurances about Thoren's credentials. *Cf. State v. Nelson*, 791 N.W.2d 414, 422–24 (Iowa 2010) ("[W]e will only allow the admission of other crimes, wrongs, or acts evidence to complete the story of the charged crime when a court cannot sever this evidence from the narrative of the charged crime without leaving the narrative unintelligible, incomprehensible, confusing, or misleading."). But L.R. did not testify she relied on Thoren having a valid massage license when she booked her appointments. To the contrary, her chiropractor recommended she find a craniosacral practitioner, and her son recommended Thoren. That Thoren lost his massage license has little, if any, probative value to the State's case. *See Huston*, 825 N.W.2d at 537 ("We see no probative value to the DHS determination the abuse report against Huston was founded. Whether or not the abuse report was deemed founded is irrelevant to any issue for the jury to decide.").

On the other side of the scale, the potential prejudice from the evidence about the Board's investigation is quite high. Because administrative agencies are arms of the state, there is a risk that juries will treat agency findings as official, state-sanctioned results. *Id.* at 537–38 ("[W]e see a real danger the jury will be unfairly influenced by that agency finding, which gives the 'imprimatur' of a purportedly unbiased state agency on a conclusion that Huston was guilty of child abuse."). Allowing the State to introduce administrative findings as

evidence in a criminal trial creates a substantial risk that the jury will substitute the agency's judgment for its own. *Id.* at 539; *see also United States v. Vasquez*, 540 F. App'x 623, 626 (9th Cir. 2013) (affirming exclusion from defendant's trial for assault evidence about prison administrative reports concluding inmates' fight was mutual, explaining "[t]he evidence, burden of proof, and ultimate penalty in the prison's disciplinary action were not the same as those in the criminal case," such that "admitting [the investigative reports] runs the risk of substantial unfair prejudice" (second alteration in original)); *State v. Renfro*, 157 A.3d 775, 777 (Me. 2017) (holding district court properly excluded from OWI trial evidence that administrative hearing examiner found that defendant's breath test had been improperly administered and rescinded license revocation, explaining "[t]he court recognized the real potential for the jury to substitute the decision of the hearing examiner—reached in a different context, based on a different standard of proof, and applying a relaxed evidentiary standard—for its own weighing of the evidence admitted in the criminal trial to determine whether the State proved the elements of [OWI] beyond a reasonable doubt"). Although the Board's investigation involved a complaint of sexual assault by a different victim, similar concerns exist that the jury could give undue weight to the Board's findings.

In light of these concerns, the use of evidence from the Board's investigation to enhance the credibility of the witnesses and the victim created a substantial risk of unfair prejudice. *See Huston*, 825 N.W.2d at 537 ("In child abuse cases, much evidence will be 'at least somewhat prejudicial. Exclusion is

required only when evidence is unfairly prejudicial [in a way that] substantially outweighs its probative value.' " (quoting *Mitchell*, 633 N.W.2d at 301 (Neuman, J., dissenting) (alteration in original))). The Board's combined statement of charges concluded that Thoren had touched a client's breasts for nontherapeutic purposes. The jury could have understood this as an official, state-sanctioned finding that met the criminal standards when in reality it was the result of a settlement. The State emphasized the Board findings in its closing argument. That the Board was investigating events different from those involved in the criminal trial does not minimize the significant risk of the jury substituting the Board's judgment in place of its own. Due to its minimal probative value and high risk of prejudice, the evidence from the Board investigation should have been excluded.

In making this determination, we take guidance from our prior decision in *State v. Huston*, 825 N.W.2d 531. There we held it was reversible error in a child endangerment prosecution to allow evidence that the department of human services had investigated and issued a founded report of child abuse against the defendant. *Id.* at 539–40. We reasoned there was a real danger that the jury would be unfairly influenced by this finding. *Id.* at 537–38. Similar concerns exist here. The women who complained to the Board appeared at trial and testified. Thus, to the extent their testimony was relevant and that relevance was not outweighed by the danger of unfair prejudice (which we take up next), there was no need to introduce evidence about the Board's investigation. The jury could evaluate those incidents based on the testimony of the women involved.

**B. Prior Bad Acts Evidence.** Thoren also argues that the testimony from his five former clients should have been excluded under rule 5.404(*b*)'s limits on the use of prior acts evidence. Specifically, Thoren argues the testimony was improperly used as propensity evidence and allowed the jury to conclude that because Thoren had sexually abused five former clients, he must have also sexually abused L.R.

While relevant evidence is generally admissible unless its prejudice outweighs its probative value, *see* rules 5.402 and 5.403, rule 5.404(*b*) sets out a specific rule governing admissibility of evidence of other crimes, wrongs, or acts—i.e., prior bad acts evidence—and outlines the criteria for when it is admissible:

> (1) *Prohibited use.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

> (2) *Permitted uses.* This evidence may be admissible for another purpose such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Iowa R. Evid. 5.404(*b*). Rule 5.404(*b*) "is a codification of our common-law rule that one crime cannot be proved by proof of another." *State v. Castaneda*, 621 N.W.2d 435, 439 (Iowa 2001) (en banc). We have described rule 5.404(*b*) as a rule of exclusion: "unless the prosecutor can articulate a valid, noncharacter theory of admissibility for admission of the bad-acts evidence, such evidence should not be admitted." *State v. Sullivan*, 679 N.W.2d 19, 28 (Iowa 2004) (overruling *State v. McDaniel*, 512 N.W.2d 305 (Iowa 1994), to the extent it described the rule as one of inclusion rather than exclusion); *see also State v.*

*Richards*, 879 N.W.2d 140, 153 (Iowa 2016) ("Our decision today does not—and we do not intend it to—retreat from our well-established understanding that rule 5.404(*b*) is a rule of exclusion.").

Notwithstanding rule 5.404(*b*), Iowa Code section 701.11 expressly allows propensity evidence in sexual assault cases. Iowa Code § 701.11(1) (2018) ("In a criminal prosecution in which a defendant has been charged with sexual abuse, evidence of the defendant's commission of another sexual abuse is admissible and may be considered for its bearing on any matter for which the evidence is relevant."). In *State v. Cox*, we held section 701.11 violated a defendant's due process rights to the extent "it permit[ted] admission of prior bad acts against an individual other than the victim in the case to demonstrate general propensity." 781 N.W.2d 757, 768–69 (Iowa 2010). Thus, evidence of prior sexual abuse involving a different victim is admissible in Iowa courts only if it fits within the rule 5.404(*b*) framework.[2]

---

[2]We recognize this puts us at odds with how federal courts and some other state courts treat evidence of prior acts involving different victims in sexual assault cases. Congress added rules 413 and 414 to the federal rules of evidence, which provide that in cases involving charges of sexual assault "evidence that the defendant committed a prior similar offense 'may be considered for its bearing on any matter to which it is relevant,' including the defendant's propensity to commit such offenses." *United States v. Gabe*, 237 F.3d 954, 959, (8th Cir. 2001) (quoting Fed. Rs. Evid. 413(a), 414(a)); *see also United States v. Guardia*, 135 F.3d 1326, 1329 (10th Cir. 1998) ("Rule 413 supersedes Rule 404(b)'s restriction and allows the government to offer evidence of a defendant's prior conduct for the purpose of demonstrating a defendant's propensity to commit the charged offense."). In *Cox*, we considered and rejected cases that upheld the constitutionality of Federal Rule of Evidence 413 against due process challenges. *See* 781 N.W.2d at 768 ("Unlike the federal courts that have considered this issue, we do not believe evidence of prior bad acts can be admitted for the sole purpose of showing general propensity even if a trial judge considers the balancing test found in Iowa Code section 701.11." (citing *United States. v. LeMay*, 260 F.3d 1018, 1026 (9th Cir. 2001))).

A number of states have statutes or rules similar to section 701.11, which their courts apply to allow propensity evidence in some types of sexual abuse cases. *See* Basyle J. Tchividjian, *Predators and Propensity: The Proper Approach for Determining the Admissibility of Prior Bad Acts Evidence in Child Sexual Abuse Prosecutions*, 39 Am. J. Crim. L. 327, 340 (2012) ("Today,

Prior bad acts evidence is always propensity evidence in the sense that it has the "potential for the jury to draw the inference . . . that because the defendant did this kind of thing before, he did it on the charged occasion." *State v. Richins*, 496 P.3d 158, 166 (Utah 2021). But rule 5.404(*b*) only excludes prior acts evidence if it "serves *no purpose except* to show the defendant is a bad person." *State v. Rodriquez*, 636 N.W.2d 234, 239 (Iowa 2001) (emphasis added). When evidence of prior acts is relevant to a nonpropensity purpose, the evidence is admissible even though it is still propensity evidence. The Utah Supreme Court cogently explained:

> One way to think of rule 404(b)(2)'s list is as circumstances where we have concluded that evidence of past acts might be presented to the jury in a way that will direct the jury away from the improper propensity inference that rule 404(b) is designed to protect against. . . . [R]ule 404(b)(1) maintains that such an inference would be improper. But we nevertheless believe that when prior-acts evidence is introduced for another purpose under rule 404(b)(2), we can trust the jury to maintain its focus on the permissible, non-propensity-based inference.

*Richins*, 496 P.3d at 166.

Given the risk of improper use of prior acts evidence, we require the district court to engage in a three-part analysis when considering its admissibility. *State v. Putman*, 848 N.W.2d 1, 8–9 (Iowa 2014). The court must first "determine whether the evidence is relevant to a legitimate, disputed factual issue." *Id.* at 9. Second, the evidence must provide "clear proof" that the defendant engaged in the act. *Id.* Mere speculation or hearsay is not enough, but "[t]estimony of

---

approximately twenty-three states and the District of Columbia follow some form of the 'lustful disposition' exception created either by judicial application or legislative codification."). The views supported by those jurisdictions are contrary to our holding in *Cox*, and we do not consider them.

credible witnesses can satisfy the clear-proof requirement." *Id.* Finally, the court must consider whether the evidence's "probative value is substantially outweighed by the danger of unfair prejudice to the defendant." *Sullivan*, 679 N.W.2d at 25.

To satisfy the first element, the party introducing the evidence must "articulate a tenable noncharacter theory of logical relevance" between that evidence and a legitimate, disputed factual issue. *Id.* at 28 (quoting Edward J. Imwinkelried, *The Use of Evidence of an Accused's Uncharged Misconduct to Prove Mens Rea: The Doctrines Which Threaten to Engulf the Character Evidence Prohibition*, 51 Ohio St. L.J. 575, 585 (1990)); *cf. State v. Reynolds*, 765 N.W.2d 283, 290 (Iowa 2009) ("It is generally impossible to rule on the admissibility of prior bad acts before trial because their admissibility is so contingent on what '*legitimate* issue[s] [are] in the case.' " (alterations in original) (quoting *Sullivan*, 679 N.W.2d at 25), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699 (Iowa 2016)). Although not all-inclusive, rule 5.404(*b*)(2) includes a list of acceptable ways that prior bad acts evidence can be relevant to a legitimate issue: "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Iowa R. Evid. 5.404(*b*)(2).

Here, the State generally identified motive, intent, and lack of mistake or accident to support admission of the prior bad acts evidence. The district court and the court of appeals both recited the same litany of noncharacter purposes for the prior acts evidence without addressing how each was actually at issue in

Thoren's case.[3] Even when prior bad acts evidence is admissible as relevant to a noncharacter purpose, its use should be limited to the specific purpose to which it is relevant. *See Putman*, 848 N.W.2d at 15–16 (affirming use of prior bad acts evidence where the jury was reminded by the state in closing and by the district court in jury instructions "on the narrow purposes for which th[e] evidence could be used"). Given the nature of the evidence and the real risk that the jury will use the evidence for an improper purpose, it is critical for the district court to identify the specific purpose or purposes to which the evidence is relevant. Two decades ago we cautioned district courts to give a limiting jury instruction even if not requested. *See Rodriquez*, 636 N.W.2d at 243 n.2 ("In the future, trial courts would be wise to give such an instruction to the jury, even if not specifically requested by the defendant, whenever bad acts evidence is introduced for a limited purpose."). The court cannot give a proper limiting instruction without first identifying which purposes are legitimately at issue. We therefore consider each of the bases offered to support use of the testimony from Thoren's former clients. *See, e.g., Putman*, 848 N.W.2d at 10–11 (considering

---

[3]Justice Mansfield's special concurrence essentially does the same thing, glossing over the need to identify a legitimate disputed factual issue the jury must actually decide. The concurrence identifies "intent" as the disputed issue without explaining how intent is actually at issue. The entirety of the concurrence's reasoning is that "evidence that Thoren intentionally committed nonconsensual sexual touching on one or more clients could, under some circumstances, tend to prove he intended to commit—and therefore did commit—a sexual assault against L.R." That's not a dispute over intent; that's propensity. Without explaining how intent is even at issue, the concurrence prefers to slide past the first step of our 5.404(*b*) analysis and jump to the last step by applying a rule 5.403-type balancing test. That "[m]ost trial judges recognize this point intuitively" and base their rule 5.404(*b*) decisions on how similar the prior acts and timing are to the current charge highlights the district court's error in this case. The concurrence's analysis replaces our carefully crafted rule 5.404(*b*) regime with the rule 5.403 balancing test most familiar to district court judges. While easier, it is not better. Nor is it allowed by our rules or our precedent.

each issue offered by the state to support prior bad acts, including motive and identity of the perpetrator); *Cox*, 781 N.W.2d at 769–71 (considering each issue offered by the state, including opportunity or preparation, common scheme or plan, modus operandi, and motive or intent).

1. *Intent or motive.* Although the district court found the testimony was probative of Thoren's intent and motive, it failed to first address whether intent or motive was actually at issue. *See State v. Taylor*, 689 N.W.2d 116, 124 (Iowa 2004) ("It is first essential to identify whether intent was at issue in the case."); *Sullivan*, 679 N.W.2d at 25 (requiring evidence be relevant "to a legitimate issue in the case other than a general propensity to commit wrongful acts" (emphasis omitted)). We begin our analysis there.

While they are often lumped together, motive and intent are not merely synonyms for the same concept. "Motive is the impetus that supplies the reason for a person to commit a criminal act." *Putman*, 848 N.W.2d at 10 (emphasis omitted) (quoting 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 404.22[3], at 404–119 to –120 (Joseph M. McLaughlin ed., 2d. ed. 2014)). Although motive is rarely an element of an offense, prior bad acts may be relevant to provide context and help explain why the defendant committed the charged acts. In *State v. Richards*, evidence of the defendant's drinking problem and his ex-wife's pressure for him to stop provided "a reason why Richards would have killed his ex-wife to whom he had recently become reengaged." 809 N.W.2d 80, 92 (Iowa 2012). In *State v. Barnes*, evidence of the defendant's desire to "get back at" his sister helped explain, or provide a motive, for why he stole her

property. 791 N.W.2d 817, 827 (Iowa 2010). And in *State v. Nelson*, evidence of the defendant's prior drug dealing was relevant in a first degree murder case to explain why he would shoot and kill someone he thought to be an undercover narcotics officer—to avoid apprehension. 791 N.W.2d at 425–26.

But evidence of prior inappropriate sexual contact with other clients does not help explain Thoren's motive in sexually abusing L.R. Unlike *Richards* and *Barnes*, the fact that Thoren had previously inappropriately touched other massage clients has no bearing on his relationship with L.R. Nor do Thoren's past abuses give him a reason for later sexually abusing L.R. In this context, when the state offers evidence of prior sex acts to prove motive, it is really offering it to prove intent without showing that intent is actually at issue. Used in this way, the testimony shows only that Thoren has a generalized motive to sexually abuse his massage clients and so his motive when treating L.R. was to sexually abuse her. This rationale overgeneralizes the relevancy of motive to a criminal prosecution, disguising what is really just propensity evidence. "The motive for [sexual assault] crimes [is] obviously and inherently sexual, so any purported use to that end [i]s pretextual or inadequate." *Jackson v. Commonwealth*, No. 2019–SC–0597–MR, 2021 WL 2618168, at *7 (Ky. June 17, 2021) (Minton, C.J., concurring in result only).[4] The testimony should not have been admitted to

---

[4]This is the rational Justice Mansfield uses in his special concurrence to conclude the prior conduct is relevant to Thoren's intent generally to commit a sexual assault. A defendant charged with a sex crime can always be said to have a motive or intent to commit a sex act. However, allowing the state to use that intent as the basis for admitting evidence of prior sex acts when intent is not a legitimate disputed issue for the jury to decide would allow the state to always offer evidence of prior sex acts with other victims in sex abuse cases, a result we rejected in *Cox*. 781 N.W.2d at 771.

prove Thoren's motive. *See, e.g.*, *Putman*, 848 N.W.2d at 10 ("The perpetrator's motive for sexually abusing L.R. was not a legitimate or disputed issue in this case."); *cf. State v. Goodson*, 958 N.W.2d 791, 801 (Iowa 2021) (affirming the admission of prior sexual abuse involving the same victim because "[t]he nature of the relationship between A.T. and Goodson was critical in determining the motive").

The State can offer evidence from Thoren's former clients to prove intent only if Thoren's intent is a legitimate disputed issue the jury needs to decide. Intent can be at issue when it is a disputed element of the crime. In *State v. Elston*, evidence that the defendant viewed pornographic images of prepubescent girls was probative of his intent where he was charged with indecent contact with a child. *See* 735 N.W.2d 196, 200 (Iowa 2007). But that charge required the state to prove the defendant touched the victim "for the purpose of arousing or satisfying the sexual desires of either [himself or A.E.]" under Iowa Code section 709.12, putting intent directly into play. *Id.* (alteration in original). Similarly, in *State v. Allen*, we allowed testimony about sexual acts that a hypnotherapist committed against a former client because the prior acts directly related to the "pattern or practice or scheme of conduct" element of the charged offense. 565 N.W.2d 333, 336–39 (Iowa 1997). Allen was charged with sexual exploitation by a counselor under Iowa Code section 709.15(2) (1993), a class "D" felony.[5] *Allen*,

---

[5]The defendant was charged with a class "D" felony under the 1993 version of the statute. *Allen*, 565 N.W.2d at 335. A counselor committed a class "D" felony if the counselor engaged in a "pattern or practice or scheme of [sexual] conduct" with clients. Iowa Code § 709.15(1)(*f*)(1)–(2). On the other hand, engaging in sexual conduct with only a single client was either an aggravated misdemeanor or serious misdemeanor, depending on whether the client was "emotionally

565 N.W.2d at 335. That crime occurs when there is a "*pattern or practice or scheme of conduct*" of engaging in sexual conduct with a client "for the purpose of arousing or satisfying the sexual desires of the counselor" or the client. Iowa Code § 709.15(1)(*f*) (emphasis added). An isolated incident would only have allowed the state to charge Allen with the lesser offense of engaging in sexual conduct with a client. *Id.* § 709.15(3)–(4). We affirmed the district court's admission of the prior client's testimony because it tended to show the required pattern or scheme of conduct in the defendant's behavior. *Allen*, 565 N.W.2d at 339. In contrast, in *State v. Putman* we held that evidence of "[t]he perpetrator's motive for sexually abusing [the victim] was not a legitimate or disputed issue in this case" because "[t]he State was not required to prove Putman's state of mind as an element of the crime." 848 N.W.2d at 10. Here, the State charged Thoren with one count of sexual abuse in the third degree by forcing the victim to perform a sex act against her will or by force. This is a general-intent crime so the State is not required to show intent as an element of the charge. *State v. McNitt*, 451 N.W.2d 824, 824 (Iowa 1990).

Although the jury was also instructed on the lesser included offense of assault with intent to commit sexual abuse, so that intent was an element, intent still needs to be disputed. Intent is often a disputed issue for assault with intent to commit sexual abuse—essentially an incomplete sex abuse crime—where the state must prove the defendant had the specific intent to commit a sex act even

dependent." *Id.* § 709.15(1)(*f*)(2)–(3), .15(3), .15(4). Since the state charged the defendant with a class "D" felony, the pattern of conduct became a disputed issue that the state needed to prove.

though the sex act was not completed. In that instance, the state must prove something the defendant intended to do but didn't. *See State v. Casady*, 491 N.W.2d 782, 785–86 (Iowa 1992) (en banc) (allowing evidence defendant had previously forced two other women into his car and sexually assaulted them as evidence of the defendant's intent when he unsuccessfully tried to pull a thirteen-year-old girl into his car); *State v. Spargo*, 364 N.W.2d 203, 205–06, 209 (Iowa 1985) (allowing evidence defendant had invited other boys to his apartment, engaged them in philosophical discussions about life and sex, and sexually abused them as evidence of the defendant's intent to commit a sex act with another boy the defendant similarly engaged but was stopped before completing a sex act).

Yet, the elements of a charged offense do not automatically become legitimate, disputed factual issues in a case. We have cautioned that "[e]vidence of an unconnected prior crime is always evidence of propensity and never evidence of a specific intent to commit the crime charged." *Taylor*, 689 N.W.2d at 128 n.6 (quoting *Sullivan*, 679 N.W.2d at 26). Federal courts have recognized as much in allowing very similar evidence under rule 413, while acknowledging it would be excluded under rule 404(b). *See United States v. Guardia*, 135 F.3d 1326, 1328–29 (10th Cir. 1998) (allowing evidence under rule 413, because "[i]f believed, the Rule 413 evidence in this case would demonstrate that the defendant has a propensity to take advantage of female patients by touching them in a salacious manner and making comments while doing so. Because the defendant's propensity is to engage in conduct which closely matches that

alleged in this case, the evidence is probative of his guilt."). "Where intent is merely a formal issue derived from the elements of the offense, and is not being controverted, the argument for receiving [other acts] evidence falters." *Richards*, 879 N.W.2d at 147 (alteration in original) (quoting *Thompson v. United States*, 546 A.2d 414, 422 (D.C. 1988)).

Because many crimes require some showing of mens rea, admitting prior bad acts testimony every time a charge includes some notion of specific intent would eviscerate rule 5.404(*b*). *Id.* at 147–48 ("*Sullivan*'s emphasis on the question whether the other acts evidence is relevant to a 'legitimate issue' is significant. That emphasis is significant because 'the jury is less likely to concentrate on propensity if there is a bona fide dispute on mens rea.'" (citation omitted) (quoting *State v. Henderson*, 696 N.W.2d 5, 16 (Iowa 2005) (Lavorato, C.J., concurring specially))). Thus, even if intent is an element of the lesser included offense, prior bad acts evidence is not relevant unless intent is actually in dispute. *See id.*

Although the lesser included offense of assault with intent to commit a sex act was instructed to the jury, the State made no effort to prove intent at trial and Thoren raised no defenses about intent. Intent and motive do not become controverted issues at trial simply because a lesser included offense has some mens rea element. *See State v. Gibson*, 52 P.3d 339, 346 (Kan. Ct. App. 2002) ("The crucial distinction in admitting evidence of other crimes . . . on the issue of intent is not whether the crime is a specific or general intent crime, but whether the defendant has claimed that his or her acts were innocent." (citation

omitted)). As tried, the testimony was not relevant to proving intent or motive simply because the lesser included charge had an intent element. The district court abused its discretion in allowing the State to use testimony from Thoren's former clients to prove motive or intent.

2. *Lack of accident.* The State also argues the former clients' testimony helped prove that Thoren did not accidentally touch L.R. and that he had no therapeutic reason to touch her vaginal area. Prior bad acts evidence can be admitted to show the touching or assault was not accidental. *See Taylor*, 689 N.W.2d at 125 (citing *Stewart v. State*, 730 So. 2d 1203, 1234 (Ala. Crim. App. 1997)). Accident is at issue when a defendant claims he touched intimate parts of the victim's body either accidentally, such as while playing, or for a legitimate reason, such as bathing or giving a medical treatment to a child. *See, e.g., United States v. Mosquito*, 532 F. Supp. 3d 1074, 1080 (E.D. Okla. 2021) (allowing evidence of prior incidents under rule 404(b) to "contradict defendant's explanation . . . that he merely intended to change the child's diaper"); *State v. Brammer*, 614 S.W.3d 18, 28 (Mo. Ct. App. 2020) (evidence of defendant's prior conviction for sex abuse against a minor was admissible to counter defendant's claim he accidentally brushed fourteen-year-old's breast while they were riding a four-wheeler).

But Thoren never argued that he accidentally touched L.R. or that he touched her vaginal area for therapeutic purposes. *Cf. Elston*, 735 N.W.2d at 200 (concluding evidence defendant had accessed pornographic pictures of young girls was especially probative after defense attorney asked child victim on cross-

examination if it was possible defendant accidentally touch her between her clothed legs). He flat-out denied ever touching L.R. below her belly button. Just as the elements of a charge are not automatically disputed issues, the explanation for Thoren's inappropriate touching is not automatically considered a disputed issue simply because Thoren could have raised it as a defense. The reason Thoren touched L.R.'s vaginal area was never a legitimate issue at trial; the disputed issue was whether the touching actually occurred. The district court abused its discretion in allowing the State to use the former clients' testimony to prove a lack of accident.

3. *Credibility.* The State, district court, and court of appeals also considered the former clients' testimony relevant to credibility on the theory that evidence of similar inappropriate actions in similar settings is important in a he said, she said case because it bolsters the victim's credibility and makes it more probable that the defendant is being dishonest. But we have rejected use of prior bad acts evidence when used solely to bolster the victim's credibility. *See Mitchell*, 633 N.W.2d at 300 ("If the State is allowed to prevail on its theory that there is an independent relevancy to bad-acts evidence for credibility purposes, this doctrine could be invoked in nearly every criminal case."). Allowing a jury to consider the evidence for credibility purposes is essentially allowing it to use it for propensity purposes—he did it before so he must be lying about not doing it now. Prior bad acts evidence cannot be used solely to bolster the victim's credibility, especially in a he said, she said case. *Id.*

4. *Modus operandi, common plan or scheme.* Although not argued on appeal, we briefly address two other arguments made by the State below—that the prior acts could be admissible to show either Thoren's modus operandi or his plan to use his position as a therapist to sexually abuse his clients. *See State ex rel. Dickey v. Besler*, 954 N.W.2d 425, 432 (Iowa 2021) (holding we may affirm on any basis urged below); *In re M.W.*, 876 N.W.2d 212, 221 (Iowa 2016) (recognizing our obligation to affirm where any proper basis exists to do so).

"Modus operandi is ' "a distinct pattern or method of procedure thought to be characteristic of an individual criminal[ ] and habitually followed by him" ' " that is typically relevant to prove identity or lack of consent. *Cox*, 781 N.W.2d at 770 (alteration in original) (quoting *State v. Plaster*, 424 N.W.2d 226, 231 (Iowa 1988) (en banc)); *see also Putman*, 848 N.W.2d at 11 ("To permit the inference that similar acts establish the same person committed both acts, we have required that the other acts must be 'strikingly similar' or of a 'unique nature.' " (quoting *In re J.A.L.*, 694 N.W.2d 748, 753 (Iowa 2005))). But neither identity nor consent was at issue here. "[T]o expand modus operandi to all similar crimes without requiring that they be offered to demonstrate a legitimate issue would simply admit prior bad acts to show propensity." *Cox*, 781 N.W.2d at 770.[6]

---

[6]Justice Mansfield's reliance on *Putman* ignores that the culprit's identity was disputed there, which is what made modus operandi relevant. 848 N.W.2d at 13. Likewise, the special concurrence's reliance on *Allen* as the "most analogous case factually" to this case ignores that *Allen* involved an entirely different offense that required the state to prove a "pattern or practice or scheme of conduct" of engaging in sexual conduct with more than one client "for the purpose of arousing or satisfying the sexual desires of the counselor" or the client. 565 N.W.2d at 337 (quoting Iowa Code § 709.15(1)(*f*)). To the extent *Allen* supports allowing evidence of unrelated but similar acts as generally "relevant to establishing such factors as motive, intent, opportunity, and plan," *id.* at 339, it is contrary to the stricter standard we have since developed for allowing 5.404(*b*) evidence in *Cox*, a case not even cited by the concurrence. The concurrence pines for

"Common scheme or plan means more than the commission of two similar crimes by the same person." *Id.* at 769 (quoting *State v. Wright*, 191 N.W.2d 638, 641 (Iowa 1971)). "Although not an element of an offense, plan suggests mental preparation and a decision to go forward with criminal activity. The physical acts accompanying the plan must bear some relationship to completion of the larger offense." 7 Laurie Kratky Dorè, *Iowa Practice Series Evidence* § 5.404:6, at 274 (2018–19 ed. 2018) [hereinafter Dorè]. "Evidence of other crimes should never be admitted when it appears that the defendant committed them wholly independent of the one for which he is then on trial. There must be some connection between the crimes." *Cox*, 781 N.W.2d at 769–70 (citation omitted) (quoting *Wright*, 191 N.W.2d at 641).

Although some jurisdictions broadly apply the common scheme or plan basis for allowing prior acts evidence, *see* 22B Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5252, at 265 (2017) [hereinafter Wright & Graham] (noting the danger when courts read "plan" in rule 404(b) broadly "as a blueprint" rather than narrowly "as a subdivision map," where "such use will lead the jurors to suppose that they can convict defendant if they find he has bad character"), we heed our precedent recognizing the purpose of this exception to the propensity exclusion rule is limited to allowing evidence that is part of a larger, related plan of illegal activity. *See* 7 Dorè § 5.404:6, at 274–75 ("In State v. Cox, the Iowa Supreme Court cautioned against reading the

---

simpler days when showing general relevance to the litany of 5.404(*b*)(2) factors was enough, but our precedent requires more. The State has not asked us to overturn *Cox*, and we will not take up that cause sua sponte.

'common plan or scheme' exception too broadly."); *see also* 22B Wright & Graham § 5252, at 277 n.47 (concluding Professor Dorè "state[d] [the] rule properly" in 7 Iowa Practice Series § 5.404:6). We agree with Professor Leonard that "if not carefully policed, this exception can serve to admit a series of crimes whose most obvious relationship is that they were all committed by the defendant and whose strongest tendency is to prove the defendant's character for crime rather than his planned course of conduct." David P. Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events* § 9.2.2, at 644–47 (Richard D. Friedman ed., 2d ed. 2019) [hereinafter Leonard] (quoting 22 Wright & Graham § 5244, at 500 (1978)) (discussing criticisms of a broad application of the common scheme or plan basis for admitting 404(b) evidence). The testimony from Thoren's five former clients spans nearly ten years and involves wholly independent acts and unrelated victims, precluding the evidence from meeting our common scheme or plan jurisprudence.

5. *Lack of victim's mistake.* Whether lack of mistake was a legitimate, disputed issue at trial is a closer call. Mistake usually arises in the context of the defendant's mistake—was the defendant's conduct the result of a mistake rather than criminal behavior. *See, e.g., United States v. Tanner*, 61 F.3d 231, 237 (4th Cir. 1995) (witness's testimony that pharmacist illegally refilled her prescriptions over five year period was relevant to rebut claim of mistake in prosecution for selling prescription drugs without a valid prescription); *Dean v. Sanders County*, 204 P.3d 722, 728 (Mont. 2009) (evidence of employee's marijuana use and connection to known drug dealer's marijuana business

admissible to rebut employee's claim in wrongful termination case that she did not realize payments were for illegal drugs when described only as "weed"). A defendant who claims to have acted by mistake puts his intent into issue—did he act mistakenly or intentionally? *See* Leonard § 7.2.2, at 474 ("Most codified versions of the uncharged misconduct rule, including Federal Rule of Evidence 404(b), list 'intent' and 'absence of mistake or accident' separately. It is unnecessary to do so. 'Absence of mistake or accident' is generally synonymous with intent.").

But rule 5.404(*b*)(2)'s reference to mistake or accident is not strictly limited to a mistake or accident by the defendant. *See, e.g.*, *People v. Deeney*, 193 Cal. Rptr. 608, 612–13 (Ct. App. 1983) (recognizing that rule 404(b)'s reference to mistake or accident generally refers to whether the defendant's actions were mistaken or accidental but also recognizing that even though "there was no issue regarding whether [*the defendant*'s] conduct was accidental or mistaken," "evidence of prior bad acts may properly be admitted to . . . overcome any material matter sought to be proved by the defense" in addressing whether a husband's prior abuse of his wife was admissible to rebut his claim that his wife was an alcoholic and often fell to show her death was an accident). In some circumstances mistake can also arise in the context of the victim's mistake when the defendant presents specific evidence to support a theory that the victim was mistaken about what happened, say because the victim was hallucinating or, as here, was experiencing phantom touches associated with a Reiki treatment so that she only imagined what she felt. *See, e.g.*, *Koo v. State*, 640 N.E.2d 95, 100–

02 (Ind. Ct. App. 1994) (holding evidence from two former patients that physician drugged and raped them during medical exam admissible, under newly enacted Indiana Rule of Evidence 404(b), to rebut defendant's claim victim hallucinated the claimed sexual encounter); *State v. Lough*, 889 P.2d 487, 495 (Wash. 1995) (en banc) ("[E]vidence of prior druggings and rapes [by the defendant] was relevant to the specific issue of whether the conduct on which the charge was based actually occurred or was, as the Defendant contended, a fabrication or mistake by the victim."). In this context, evidence of the defendant's prior actions is not relevant to a mistake that goes the defendant's intent but is relevant to rebut a specific-defense theory of mistake by the victim.

Thoren's theory at trial was that L.R. imagined he touched her vaginal area during the Reiki therapy when in fact he never touched below her belly button. Both sides called expert witnesses at trial to discuss Reiki therapy and the possibility of experiencing "phantom touches" during a Reiki session. According to witnesses from both the State and Thoren, clients often feel a sensation of being touched during Reiki treatments in places where no physical contact has occurred. This testimony was essential to Thoren's defense that he did not touch L.R. below her belly button and that she imagined the rubbing of her vaginal area. Given the significant trial testimony devoted to describing Reiki treatment and phantom touches, whether L.R. mistakenly believed that Thoren touched her vaginal area was a legitimate and disputed issue at trial.

With lack of mistake at issue, we must determine whether the testimony from Thoren's five former clients was relevant. Evidence is relevant if "it has any

tendency to make a fact more or less probable than it would be without the evidence[] and . . . [t]he fact is of consequence in determining the action." Iowa R. Evid. 5.401. In *State v. Lough*, the Washington Supreme Court allowed evidence that the paramedic defendant had drugged and raped other victims as relevant to whether the victim was mistaken about what had happened, noting her credibility was difficult to assess given her foggy memory from being drugged. 889 P.2d at 495.[7] And in *Koo v. State*, the Indiana Court of Appeals allowed testimony from two former patients of the defendant-physician that he had drugged and raped them during physical exams to rebut the defendant's evidence that the victim's use of prescription drugs could have caused sexual hallucinations. 640 N.E.2d at 101–02. The defendant questioned pharmacists about the frequency of the victim's refills for Valium and Codeine in the months leading up to the alleged incident, the hallucinatory effects of those drugs when used together, and whether the victim's shaking hands after the incident could indicate she was going through withdrawal. *See id.* He also presented evidence that the doctor's office looked different than the victim described and then used that evidence in closing argument to support his argument the victim had hallucinated the events. *Id.* Given the extensive evidence here about phantom touches during Reiki sessions, evidence that Thoren touched other clients

---

[7]In *Lough*, the court concluded evidence from the former victims was also admissible to show a common design or plan. 889 P.2d at 494. Although the evidence here does not meet our common design or scheme jurisprudence, *see Cox*, 781 N.W.2d at 769–70, we nonetheless find *Lough* convincing to the extent it addresses a victim's mistake.

inappropriately during therapy sessions is relevant to rebut Thoren's claim that L.R. experienced phantom touching rather than felt Thoren's hand.

Even when prior bad acts may be relevant to a legitimate and disputed factual issue at trial, we are cautious to only allow such evidence that is both "relevant and necessary." *Cox,* 781 N.W. 2d at 768. In *Koo,* the court allowed evidence from two former patients who described details similar to those described by the victim, including that the defendant taped the examining sheet to an overhead lamp so they couldn't see what he was doing, giving credence to the victim's similar story. *Id.* at 100–01. We recognize that the testimony from Thoren's former clients differs from his abuse of L.R. in some significant ways. The former clients testified they were inappropriately touched during a traditional massage that necessarily involved direct physical contact. L.R. claimed she was abused during a Reiki session, which, as described by witnesses presented by both parties, differs from the type of physical contact received during a traditional massage. The former clients were all unclothed for their massages, while L.R. was fully clothed. The disputed issue is whether L.R. imagined the contact by experiencing phantom touching, which was not an issue for the former clients who were clearly touched. In addition, the events were not close in time, spanning a period of nearly ten years.

We nonetheless find the evidence relevant given the unique nature of this sexual abuse case involving significant evidence about alternative healing modalities and phantom touches. Thoren claimed that L.R. imagined the physical touching she testified she felt—even claiming L.R. stated she

experienced the deepest orgasm she had ever felt. L.R., whose eyes were covered, described the events differently, but not in a way that totally contradicted Thoren's theory. Even with the differences between L.R.'s Reiki treatment and the former clients' massage sessions, evidence that Thoren crossed the line by inappropriately touching clients in a sexual manner during other therapy sessions might make a difference to a reasonable fact finder on the issue of whether L.R. could have imagined the physical contact she described. *See Putman*, 848 N.W.2d at 8–9 ("The general test for relevancy is 'whether a reasonable [person] might believe the probability of the truth of the consequential fact to be different if [the person] knew of the proffered evidence.' " (alterations in original) (quoting *Plaster*, 424 N.W.2d at 229)). The testimony from Thoren's former clients about his inappropriate conduct was relevant to whether Thoren rubbed his hand over L.R.'s vaginal area as she described, a fact of consequence given the unusual facts of this case.

Having concluded the evidence was relevant to a disputed issue, we next determine whether its "probative value is substantially outweighed by the danger of unfair prejudice to the defendant."[8] *Sullivan*, 679 N.W.2d at 25. We consider a number of factors, including:

> the need for the evidence in light of the issues and the other evidence available to the prosecution, whether there is clear proof the defendant committed the prior bad acts, the strength or weakness

---

[8]Thoren does not dispute that the former clients' testimony satisfies the requirement for "clear proof" that he committed the prior conduct, the second step required for allowing bad acts evidence. *See Richards*, 879 N.W.2d at 152 ("[A] victim's testimony, standing alone, satisfies the requirement of clear proof." (alteration in original) (quoting *State v. Jones*, 464 N.W.2d 241, 243 (Iowa 1990))).

of the evidence on the relevant issue, and the degree to which the fact finder will be prompted to decide the case on an improper basis.

*Putman*, 848 N.W.2d at 9–10 (quoting *Taylor*, 689 N.W.2d at 124).

"Weighing probative value against prejudicial effect 'is not an exact science,' so 'we [generally] give a great deal of leeway to the trial judge who must make this judgment call.'" *Id.* at 10 (quoting *State v. Newell*, 710 N.W.2d 6, 20–21 (Iowa 2006)). Here, the district court made its call before trial in its limine ruling at a time when it lacked a full appreciation of the evidence that would be presented at trial. Whether prior bad acts evidence should be admitted is a fact-specific determination that should generally be made within the context of the other evidence presented at trial when the district court can adequately weigh the need for the evidence. *See Reynolds*, 765 N.W.2d at 290. We caution district court judges to conduct their balancing analysis at a point when they have all the relevant evidence to ensure they understand the probative value of the offered evidence and its prejudicial effect can be fully appreciated.

In addressing the need for the evidence, we note that the State put on its own witness experienced in Reiki therapy as part of its case-in-chief, and the defense put on two Reiki practitioners as well as two of Thoren's current clients who had received Reiki and craniosacral treatments from him, describing the phantom touching Thoren claimed L.R. experienced. L.R., whose eyes were covered, admittedly had to rely on her other senses in claiming that Thoren physically rubbed her vaginal area with his hand—a necessary element of the sex abuse charge. For the most part, testimony from the former clients was relatively short and to the point and focused on how Thoren inappropriately

touched each of them during a massage session, which is what made the evidence relevant to the current prosecution. The need for the evidence, coupled with the limited testimony about the prior conduct, balances in favor of allowing testimony from Thoren's former clients.

However, two witnesses testified beyond the scope of what we have found to be the relevant purpose for the evidence, that is, whether L.R. might have been mistaken about what she felt. Thoren's sister-in-law, S.T., testified about a massage she received from Thoren in his home in 2009, nine years before the events for which Thoren was convicted. In addition to testifying that he used a vibrating machine directly over her clitoris, she also testified about how Thoren's actions violated the trust she had in Thoren as her brother-in-law and the damage it did to their relationship. The facts that S.T. had a personal relationship with Thoren, received a message in his home rather than in a clinical setting, and lost trust in her brother-in-law take S.T.'s testimony well beyond the limited purpose for which the prior acts evidence was relevant to this case.

Another former client, M.L., testified that during a massage in 2012 Thoren massaged farther up the side of her breast than was appropriate and that he was panting and breathing heavy while doing so as if he was sexually aroused. Whether or not Thoren was panting and aroused has no relevance to whether L.R. felt Thoren's hand or experienced phantom touching. This testimony was not needed to support the proper purpose for the evidence but risked giving the jury an improper basis on which to decide the case. *See Putman*, 848 N.W.2d at 9–10 (considering the strength or weakness of the prior act

evidence on the relevant issue against the risk that the prior act will prompt the jury to decide the case on an improper basis). The district court abused its discretion in allowing S.T. and M.L. to testify.[9]

On balance, the probative value of the testimony from the other three former clients was not substantially outweighed by the danger of unfair prejudice to Thoren, and the district court did not abuse its discretion in admitting their testimony as relevant to the issue of whether L.R. was mistaken. *See Sullivan*, 679 N.W.2d at 25.

**V. Harmless Error.** We next determine whether the district court's errors are reversible. When a district court commits a nonconstitutional error by admitting evidence it should have excluded, we do not reverse the defendant's conviction if the error was harmless. The test for harmless error "is whether the rights of the objecting party have been 'injuriously affected by the error' or whether the party has 'suffered a miscarriage of justice.' " *State v. Parker*, 747 N.W.2d 196, 209 (Iowa 2008) (quoting *Sullivan*, 678 N.W.2d at 29). Overwhelming evidence of the defendant's guilt can make the error harmless. *Id.* at 210. "We presume prejudice and 'reverse unless the record affirmatively

---

[9]We do not prejudge what evidence should be allowed on retrial because similar testimony may be appropriate depending on why it is introduced and how it is used. *See State v. Mitchell*, 670 N.W.2d 416, 422 (Iowa 2003) (holding, in appeal from second trial following remand after district court improperly admitted prior acts evidence solely to bolster victim's credibility, that the court properly admitted the same evidence on retrial to rebut the defendant's conspiratorial theory presented in second trial); *see also Cox*, 781 N.W.2d at 771 ("Although it does not appear the testimony of A.L. and T.C. was relevant to any 'legitimate issue' and therefore was not appropriately admitted, we express no opinion regarding whether the evidence may become relevant to a legitimate issue and be admissible on retrial.").

establishes otherwise.' " *Reynolds*, 765 N.W.2d at 292 (quoting *Sullivan*, 679 N.W.2d at 30).

Our review of the trial proceedings convinces us that the district court's errors were not harmless. Although some of the evidence about Thoren's prior acts was admissible to rebut Thoren's theory that L.R. was mistaken about what she felt, the district court's failure to identify the specific purpose for which the evidence could be used prejudiced Thoren. First, it allowed evidence about the Board's investigation and testimony from S.T. and M.L. that went beyond the specific issue to which the prior act evidence was relevant. Second, it allowed the State to use even the properly admitted evidence beyond its limited purpose of rebutting Thoren's theory that L.R. experienced phantom touching. The district court painted with too broad a brush in ruling that all of the evidence could come in for the purposes of showing intent, motive, or lack of accident or mistake. The definitive pretrial ruling allowed the State to begin its case-in-chief with evidence about the Board's investigation that led Thoren to surrender his massage license followed by testimony from the five former clients. Putting "the effect of this evidence . . . in[to] perspective," *Rodriquez*, 636 N.W.2d at 243, this is not a case where the improperly admitted evidence had minimal effect or was downplayed by the State, *cf. id.* ("The State did not elicit great detail about the prior assaults and spent a relatively small amount of time on this line of questioning."). Rather, the improper evidence set the stage for the State's he said, she said case by painting Thoren as a bad actor based on events unrelated to the charged crime, bolstered by the Board's investigation, before even presenting the actual facts of

the case. The State capitalized on the improper use of the evidence in its closing argument, where it urged the jury to "rely on any of the other testimony of the other victims . . . to show, was this a mistake, was it an accident, did he intend to do this to her. He's done it to five other women."

The district court was tasked with determining the specific legitimate issues to which the evidence was relevant and limiting its use to those issues. Its failure to do so fell far short of the "model of caution" we have recognized in cases involving rule 5.404(*b*) evidence. *See Putman*, 848 N.W.2d at 16 (recognizing district court carefully analyzed each piece of prior bad acts evidence before admitting it, winnowed thousands of pornographic videos and images down to two, and then only allowed the witness to read the titles of the two videos into evidence without allowing the jury to see them); *see also Richards*, 809 N.W.2d at 93 n. 4 (applauding district court's efforts during trial where, before admitting evidence of specific prior bad acts, the court required the evidence to show the defendant's "malice" toward the victim "rather than a propensity to commit bad acts" and considered the "strength of the witness or evidence on the relevant issue").

Finally, the strength of the State's case does not make the errors harmless. The evidence against Thoren was not overwhelming where his conviction turned on whether the jury believed L.R.'s version of events or Thoren's. *See State v. Redmond*, 803 N.W.2d 112, 127 (Iowa 2011) (holding evidence of guilt was not overwhelming for purposes of harmless error review where "P.M. testified to one version of the events on that evening; Redmond to another"). The district court's

errors were not harmless, and Thoren is entitled to a new trial. *See Reynolds*, 765 N.W.2d at 293 (holding district court should have limited evidence of prior incidents between the defendant and his assault victim, concluding district court could have allowed some prior incidents but its error in admitting evidence about eleven previous events was not harmless where the state urged the jury in closing to find the defendant guilty based on the five years' worth of history, which "foretold what was going to happen September 27, 2006").

**VI. Disposition.**

We vacate the court of appeals decision, reverse Thoren's conviction, and remand the case for a new trial consistent with this opinion.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**

Christensen, C.J., and Appel and McDermott, JJ., join this opinion. Waterman, J., files an opinion concurring specially, in which Mansfield, J., joins. Mansfield, J., files an opinion concurring specially, in which Waterman and McDonald, JJ., join.

**WATERMAN, Justice (concurring specially).**

I join part IV.A of the majority opinion and concur in the result and join Justice Mansfield's special concurrence as to part IV.B. I write separately to raise an additional reason that evidence of a practitioner's voluntary settlement with a licensing board should be inadmissible in a subsequent criminal proceeding arising from the same or similar misconduct: Iowa's strong public policy to encourage settlements as reflected in Iowa Rule of Evidence 5.408.[10] The majority opinion understandably refrains from mentioning rule 5.408 because Thoren failed to raise that ground in district court or on appeal.

Iowa Rule 5.408 prohibits use of evidence of settlements to prove the validity of a disputed claim, and does so to "promot[e] . . . the public policy

---

[10]Iowa Rule of Evidence 5.408 provides:

> *a. Prohibited uses.* Evidence of the following is not admissible—on behalf of any party—to prove the validity or amount of a disputed claim:

> (1) Furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim that was disputed on either validity or amount.

> (2) Conduct or a statement made during compromise negotiations about the claim.

> *b. Exceptions.* The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Notably, Iowa Rule of Evidence 5.408 does not contain the exception added in 2006 to Federal Rule of Evidence 408, for "negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority" that is "offered in a criminal case." Fed. R. Evid. 408(a)(2). Based on that exception, the United States Court of Appeals for the Sixth Circuit on plain error review held that the district court did not abuse its discretion in a criminal billing fraud trial by admitting into evidence without objection an order by the Kentucky Board of Medical Licensure in which the defendant voluntarily surrendered his medical license to resolve charges arising out of the same misconduct. *United States v. Paulus*, 894 F.3d 267, 280 (6th Cir. 2018). *United States v. Paulus* is inapplicable because the Iowa rule lacks that exception.

favoring the compromise and settlement of disputes." *Graber v. City of Ankeny*, 616 N.W.2d 633, 638–39 (Iowa 2000) (en banc) (quoting Fed. R. Evid. 408 advisory committee's note to 1972 proposed rules). Such evidence has low probative value because the motivation to settle may be "a desire for peace rather than . . . any concession of weakness of position." *Id.* (quoting Fed. R. Evid. 408 advisory committee's note to 1972 proposed rules). In *Graber v. City of Ankeny*, we held the district court abused its discretion in admitting evidence of a settlement because allowing the evidence "would seriously undermine Iowa's public policy to encourage settlements." *Id.* at 641. The same reasoning applies here.

Our court today correctly holds that the district court abused its discretion in this criminal trial by admitting into evidence Kevin Thoren's voluntary surrender of his massage license and related documents from the Iowa Board of Massage Therapy. A contrary holding would deter other licensed professionals from voluntary settlements surrendering their license to practice if that settlement would be admissible into evidence against them in related criminal proceedings. Settlements with licensing boards should be encouraged, not discouraged. For this additional reason, I join the court's opinion requiring a retrial of the criminal charge without evidence of Thoren's settlement with the licensing board.

Mansfield, J., joins this special concurrence.

**MANSFIELD, Justice (concurring specially).**

I join part IV.A of the majority opinion. I concur in the result as to part IV.B. Specifically, I agree with the majority that the district court did not abuse its discretion in admitting the prior acts involving L.K., J.J., and A.N. but abused its discretion in admitting the prior acts involving S.T. and M.L. However, I believe the majority's analysis in IV.B confuses an important evidentiary issue. Therefore, I specially concur.

**I. The Majority's Mistake About Mistake.**

According to the majority, Kevin Thoren's prior acts of sexual misconduct against L.K., J.J., and A.N. are admissible only to prove that L.R. didn't make a mistake in claiming Thoren sexually assaulted her—i.e., to prove that the alleged victim's testimony is correct. But how is this any different from bolstering the victim's credibility, a ground that the majority states is invalid? These are two sides of the same coin.

Analytically, we need to back up and consider *how* the other incidents involving L.K., J.J., and A.N. might be relevant to prove L.R. didn't err in her testimony. They are relevant because they tell us something about Thoren, specifically that Thoren when performing therapeutic procedures on female clients has repeatedly touched them sexually against their wishes. And why is this significant? Because it tells us that Thoren derives gratification from this kind of activity and therefore is more likely to have engaged in it with L.R. In short, the underlying reason why the other incidents are relevant is to show

Thoren's motive and intent.[11] "Lack of victim mistake" is just a more circuitous way of saying the incidents help prove Thoren's motive and intent.

Again, to the extent prior bad acts by Thoren could demonstrate that L.R. didn't make a mistake, they do so by showing that Thoren had a tendency to do the same thing to other women in the same position. That is 100% propensity evidence, unless you treat it as bearing also on the defendant's motive and intent. Consider the following hypotheticals:

- *Mr. X* is stopped by a police officer for erratic driving. He refuses the Datamaster but is prosecuted for OWI. The officer testifies that he smells an alcoholic beverage on the defendant's breath and that the defendant was driving erratically, which the defendant denies. Can the state introduce evidence of the defendant's prior OWI's to prove "lack of mistake" by the cop in his testimony?

- An informant who is a heavy drug user testifies that he bought drugs from *Ms. Y*. Can the state introduce evidence of *Ms. Y*'s prior drug convictions to show "lack of mistake" by the informant—e.g., to rebut the claim that the informant was a heavy drug user and not a reliable witness?

The answer to these questions is, "Clearly no." Evidence of the defendant's prior acts is not admissible to prove absence of mistake *per se* by a complaining witness. Those acts are only admissible when the evidence is able to demonstrate something about the *defendant*'s motive, intent, plan, etc. at the time of the charged crime.

---

[11]The majority spends a page belaboring a distinction between motive and intent. I'm not sure why. This distinction may matter with respect to other crimes. For example, most drug dealers sell drugs to make money, not because they get a thrill out of the act of sale. However, with sex offenses, motive and intent tend to be one and the same—sexual gratification.

Unsurprisingly, the majority is only able to cite three out-of-state cases in support of its claim that absence of victim mistake is an independent ground for admissibility under rule 5.404(*b*). *See State v. Lough*, 889 P.2d 487, 495 (Wash. 1995) (en banc); *Koo v. State*, 640 N.E.2d 95, 100–02 (Ind. Ct. App. 1994); *People v. Deeney*, 193 Cal. Rptr. 608, 612–13 (Ct. App. 1983). The Washington Supreme Court case actually supports my position. In that court's view, the incidents with the other women showed the victim didn't make a mistake, but only by showing the defendant's "design." *Lough*, 889 P.2d at 494–95. As the court put it,

> The evidence that this Defendant rendered four other women, whom he had relationships with, unconscious with drugs and then raped them is *not* admitted to establish that the Defendant has a criminal disposition or a bad character; it is admitted to show that he committed the charged offense pursuant to the same design he used in committing the other four acts of misconduct. The evidence is admitted to show plan, not propensity. In this case, the Defendant's history of drugging women, with whom he had a personal relationship, in order to rape them while they were unconscious or confused and disoriented evidences a larger design to use his special expertise with drugs to render them unable to refuse consent to sexual intercourse. A rational trier of fact could find that the Defendant was the mastermind of an overarching plan.

*Id.* The legal analysis in the case from the Indiana Court of Appeals is pretty conclusory and, I would suggest, out of date. *See Wages v. State*, 863 N.E.2d 408, 412 (Ind. Ct. App. 2007) (noting that "[t]his part of the rule has been described as 'simply a special form of the exception that permits the use of other crimes to prove intent' ") (quoting Robert L. Miller, Jr., *Courtroom Handbook on Indiana Evidence* 80 (2007)). The California Court of Appeal case involves a very different situation *where the defendant brought up prior conduct of the victim—* i.e., her alleged accidental falls resulting in injury. *Deeney*, 193 Cal. Rptr. at

613–14. The court concluded that in some instances the state could respond with prior misconduct by the defendant against the same victim to show the prior injuries were not accidental. *Id.* That scenario has nothing to do with the present case or with the concept of "victim mistake."

The predominant view is that rule 5.404(*b*) refers to an absence of mistake *by the defendant.* This is what the treatises say. *See* 22B Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5255, at 336 (2017) ("The final listed uses for uncharged misconduct evidence in Federal Rule of Evidence 404(b)(2)—'absence of mistake, or lack of accident'—provide judges and lawyers with a more specialized application of the broader category of 'intent.' "); David P. Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events* § 7.2.2, at 474 (Richard D. Friedman ed., 2d ed. 2019) ("Most codified versions of the uncharged misconduct rule, including Federal Rule of Evidence 404(b), list 'intent' and 'absence of mistake or accident' separately. It is unnecessary to do so. 'Absence of mistake or accident' is generally synonymous with intent."). As Professor Doré puts it in her respected treatise on Iowa evidence: "Evidence proving lack of mistake or accident appears to significantly overlap proof of intent. Proof of other acts demonstrating that the defendant did not act under a mistake or accident on this occasion in essence proves intentional conduct." 7 Laurie Kratky Doré, *Iowa Practice: Evidence* § 5.404:6, at 284 (2018–2019 ed. 2018).

Thus, I believe lack of victim mistake is an unnecessary legal distraction, without support in logic or precedent.

**II. Similarity and Nearness in Time Are Two Keys to Admissibility.**

While I do not think absence of victim mistake is a basis for admissibility under rule 5.404(*b*), I would nonetheless conclude that the district court did not abuse its discretion in admitting the testimony of L.K., J.J., and A.N. Thoren vigorously disputed that he had touched L.R. sexually, and proof that he had done something similar to other women clients in the not-too-distant past for his own sexual gratification could tend to show the he intended to do so to L.R. on November 21, 2018, and therefore in fact did so.

Thoren's defense was that he did not touch L.R. in any private area, and that his purpose was never to give L.R. "sexual energy" but merely to give her "energy." For example, Thoren testified,

> I asked her a couple questions. Again, typical, when somebody is having a session, but just, how are you doing, what are you experiencing, what are you feeling, and she didn't answer. And so then I asked again. And she didn't answer. So I just dropped it, because I thought, well, she's just in a really relaxed state, doesn't want to answer. And then she made a noise, kind of a groan, and said that was the deepest orgasm I've ever had. There was nothing - - anyway.
>
> Q. So [L.R.] said that to you?
>
> A. Yes.
>
> Q. Was there anything that you said inappropriate that went before that?
>
> A. No, sir.
>
> Q. And what was your response to [L.R.] saying that?
>
> A. I immediately pulled my hands away, and I said that was not the purpose or intent, I believe is what the word I used. I may have reacted a little too strongly in that way.

Evidence that Thoren had improperly touched other female clients during their sessions could, in the right situation, tend to show that the truth was otherwise. In other words, evidence that Thoren intentionally committed nonconsensual sexual touching on one or more clients could, under some circumstances, tend to prove he intended to commit—and therefore did commit—a sexual assault against L.R.

Of course, using evidence of past misconduct to help prove the defendant committed the charged crime is fraught with danger. If the prior misconduct provides only weak evidence of the defendant's motive and intent, there is a grave risk that its legitimate use will be outweighed by its improper effects. Most trial judges recognize this point intuitively. They therefore base rule 5.404(*b*) admissibility decisions largely on how similar and how close in time the prior acts are to the charged criminal offense. The more similar and the closer in time, the greater the likelihood the evidence will be allowed to show some legitimate rule 5.404(*b*) purpose.

We recognized this point in *State v. Putman*, a case where identity was at issue and where we found that evidence of the defendant's possession of two pornography videos of very young children being raped was admissible to prove that the defendant had raped a very young child. 848 N.W.2d 1, 12–13 (Iowa 2014). We emphasized, "There is undeniable similarity between the two videos and the act for which Putman was on trial." *Id.* at 12.

The most analogous case factually to the present case is *State v. Allen*. 565 N.W.2d 333 (Iowa 1997). In a prosecution of a hypnotherapist for having sexual

relations with a client in violation of Iowa Code section 709.15(2) (1993), we upheld the admission of an incident involving another woman. *Id.* at 339. Although the majority tries to distinguish *Allen*, what we said in that case speaks for itself:

> We believe the testimony of Westphal tended to show a pattern or scheme of conduct in connection with Allen's behavior. Both Westphal and Frederick found Allen's listing in the yellow pages of the telephone directory and sought help from him for their problems—Westphal for weight loss and Frederick for unexplained physical symptoms. Allen initiated sexual contact with both women while they were in his office for treatment. The similarities between the two situations were relevant to establishing such factors as motive, intent, opportunity, and plan. *See* Iowa R. Evid. 404(*b*).

*Id.*

Other courts follow a similar analytical approach focusing on the similarity of the prior conduct on the ground that more similar conduct is more probative of motive, intent, or plan. *See, e.g., People v. Gonzales*, 377 N.E.2d 91, 100 (Ill. App. Ct. 1978) ("The attacks on the other women and the rape of the complainant bear significant similarities which rendered evidence of the former relevant as proof of the existence of a common scheme or design, and modus operandi."); *Young v. State*, 106 So. 3d 775, 780 (Miss. 2012) (en banc) ("[T]he trial court here did not abuse its discretion by admitting evidence of Young's previous sexual abuse of another prepubescent female family member, because the evidence was admissible for noncharacter purposes. Those purposes include establishing that Young's motive was a 'seemingly uncontrollable desire to partake in pedophilic sexual activities with young and developing female juveniles' and that both assaults were part of a 'common plan, scheme, or system' that involved Young

taking advantage of family relationships to engage in sexual activities with prepubescent girls."); *State v. Bommarito*, 856 S.W.2d 680, 682–83 (Mo. Ct. App. 1993) (finding that evidence that the defendant "had grabbed, fondled and forcibly kissed other women that evening . . . . was relevant to establish the motive and intent of Defendant on the evening the crime occurred"); *Commonwealth v. Gordon*, 673 A.2d 866, 869–70 (Pa. 1996) (finding that evidence that an attorney sexually assaulted three other women when they were meeting with him on legal business in similar circumstances was "relevant to prove motive, intent, absence of mistake or accident, and a common scheme or plan embracing the commission of two crimes so related to each other that proof of one tends to prove the others"); *State v. Perry*, 182 A.3d 558, 569 (R.I. 2018) (" '[T]he factors to be considered when comparing the charged incident and the prior sexual misconduct are "time, place, age, family relationships of the victims, and the form of the sexual acts." ' Looking to these factors, we conclude that the trial justice did not abuse her discretion in finding that the prior acts of sexual misconduct were similar to the charged acts." (alteration in original) (citation omitted) (quoting *State v. Mohapatra*, 880 A.2d 802, 807 (R.I. 2005))).

We need to apply that screen here, as well as the "clear proof" and "need for the evidence" rule 5.403 screens that serve a similar purpose. I agree with the majority that the trial's focus on Reiki treatment and phantom touches accentuated the need for testimony from the other women. However, that consideration goes into the rule 5.403 balancing under need for the evidence.

*See, e.g., Putman*, 848 N.W.2d at 9. It does not, as I've already noted, provide an independent ground to admit the testimony under absence of victim mistake.

Considering the similarity of the other incidents, the timeframe in which they occurred, the strength of the proof of those incidents, the need for the evidence, and the other rule 5.403 factors, I would find that the district court did not abuse its discretion in admitting evidence of testimony from L.K., J.J., and A.N. This is a close call for me because two of these incidents had occurred nearly a decade before, and I am not saying that a narrower view of admissibility would have been improper. I agree with the majority that the incidents involving S.T. and M.L. were not sufficiently similar to the charged crime to be admissible.

Waterman and McDonald, JJ., join this special concurrence.